**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DISTRICT**

| | |
|---|---|
| DOUGLAS STAHL and NRAC1, LLC,   ) | |
|          ) | |
|     Plaintiffs,   ) | |
|          ) | CIVIL ACTION |
| vs.   ) | |
|          ) | FILE NO. 2:21-CV-271-RWS |
| MICHAEL TROFIMOFF,   ) | |
| VIRIDIS HOLDINGS, LLC d/b/a   ) | |
| GEORGIA MOBILE HOME INVESTING ) | |
| and GMHI, CHIMENE VAN GUNDY,   ) | |
| and OUTSTANDING REAL ESTATE   ) | |
| SOLUTIONS, INC.,   ) | |
|          ) | |
|     Defendants.   ) | |

## COMPLAINT

COMES NOW Plaintiffs Douglas Stahl and NRAC1, LLC (collectively, "Plaintiffs"), and file this action against Defendants Michael Trofimoff, Viridis Holdings, LLC d/b/a Georgia Mobile Home Investing and GMHI, Chimene Van Gundy, and Outstanding Real Estate Solutions, Inc. (collectively, "Defendants"), respectfully showing to the Court as follows:

## SUMMARY

1.    Plaintiffs hereby assert claims against Defendants for fraud and for

-1-

breaches of a loan agreement, promissory note, and settlement agreement, and seek compensatory damages, interest, punitive damages, and their expenses of litigation, including attorneys' fees.

## **PARTIES**

2.      Plaintiff Douglas Stahl ("Stahl") is an individual citizen and resident of the state of California (Loa Angeles County).  Stahl is managing member of Plaintiff NRAC1.

3.      Plaintiff NRAC1, LLC ("NRAC1") is a Nevada limited liability company located at 3225 McLeod Drive, Suite 100, Las Vegas, Nevada 89121.

4.      Defendant Michael Trofimoff ("Trofimoff") is an individual citizen and resident of the state of Georgia, who, upon information and belief can be found and served at 273 Kelsey Mountain Road, Dillard, Rabun Couny, Georgia 30537. Trofimoff is the managing member and CEO of Defendant Viridis Holdings, LLC.

5.      Defendant Viridis Holdings, LLC ("Viridis") is a North Carolina limited liability company which is headquartered in Georgia and which may be served with process through its registered agent, Michael Trofimoff, at 273 Kelsey

Mountain Road, Dillard, Georgia 30537.[1]  Viridis is a real estate company specializing in mobile homes and mobile home parks, with its current markets in West Texas and the Atlanta, Georgia area.  See Exhibit 1, *infra.* Viridis does business as Georgia Mobile Home Investing and GMHI.

6.      Defendant Chimene Van Gundy ("Van Gundy") is an individual citizen and resident of the State of Texas, who, upon information and belief can be found and served at 614 Battistrada, New Braunfels, Texas 78132.  Van Gundy is President and CEO of Defendant Outstanding Real Estate Solutions, Inc. and is known in the real estate industry as the "Queen of Mobile Homes."  Van Gundy also operates a related business, Mobile Home Millions, where she provides training and mentoring about buying, rehabbing, selling, and investing in mobile homes and mobile home parks.

7.      Defendant Outstanding Real Estate Solutions, Inc. ("Outstanding") is a Texas corporation which may be served with process through its registered agent, Anderson Registered Agents, at 440 Louisiana, Suite 952, Houston, Texas, 77002. Outstanding is an international real estate company specializing in mobile homes

---

[1]      Viridis is deemed to be a citizen of Georgia for purposes of diversity citizenship because its managing member, Trofimoff, is a citizen of Georgia. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings, L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004).

and mobile home parks with its current markets in West Texas and the Atlanta, Georgia area.  See Exhibit 1, *infra*.

8.     At all times materials hereto, Trofimoff and Van Gundy, through their companies Viridis and Outstanding, have been engaged in and operate as a "joint venture" and partnership for the purpose of purchasing, rehabbing, selling, and financing mobile homes in the West Texas and Atlanta, Georgia area markets.  See Exhibit 1, *infra*.  Defendants and their joint venture also operate a scheme of fraudulently obtaining funding from individual lenders purportedly to finance the purchase of mobile homes, but in reality for the personal enrichment of Defendants.[2]

## **JURISDICTION AND VENUE**

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332 as there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000.00.

10.     Trofimoff is subject to the personal jurisdiction of this Court because

_____

[2]     On information and belief, there are numerous other victims of Defendants' scheme, and it is suspected that Defendants acted as an enterprise and met other requirements to be held liable for racketeering under 18 U.S.C. §§ 1962 and 1964, and that such facts will come to light in connection with Plaintiffs' prosecution of this action, at which time Plaintiffs will seek leave to amend this complaint to include claims under those code sections.

he resides and does business in this district.

11.     Viridis is subject to the personal jurisdiction of this Court because it resides and does business in this district.

12.     Van Gundy is subject to the personal jurisdiction of this Court because she has sufficient minimum contacts with the state of Georgia and has committed tortious acts or omissions and other wrongful conduct in Georgia.

13.      Outstanding is subject to the personal jurisdiction of this Court because it has sufficient minimum contacts with the state of Georgia and has committed tortious acts or omissions and other wrongful conduct in Georgia.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) because at least one Defendant resides and is subject to this Court's personal jurisdiction in this district and division and because a substantial part of the events that give rise to Plaintiffs' claims occurred in this district and division.

## **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

15.     On information and belief, Trofimoff and Van Gundy first became acquainted some years ago when Trofimoff signed up for and became a customer of Van Gundy's Mobile Home Millions program.

16.     Defendants' joint venture was formed when Van Gundy met with Trofimoff in Georgia and the two of them scouted for mobile home investment opportunities and reached an agreement to work together as a joint venture and partnership.

17.     In the investor materials, promissory note, and other documents provided by Defendants to Plaintiffs in connection with this matter, the joint venture is referred to variously as Ga Mobile Home Investing, Georgia Mobile Home Investing, and GMHI.

**Origins of the Transaction**

18.     In or about November 2020, Plaintiffs were introduced to Defendants and Defendants' joint venture in connection with an "investment" opportunity being marketed by Defendants.

19.     The opportunity presented by Defendants called for potential lenders to make a secured loan to Defendants which Defendants would repay over five (5) years with interest at a rate determined by the amount of the loan.[3]

_____

3     Documents prepared and provided by Defendants sometimes refer to this program as an investment and participants as investors and at other times as a loan and participants as lenders.  Because the true nature of the transaction is that of a loan, Plaintiffs will use that nomenclature herein unless quoting directly from Defendants' documents or describing a certain document by title.

20.     In order to explain the loan opportunity and induce potential lenders to make such loans, Defendants had prepared and provided to such potential lenders a certain *Ga Mobile Home Investing Investor Proposal* (the "Investor Proposal").  A true and correct copy of the Investor Proposal is attached as Exhibit "1" hereto.

21.     Plaintiffs received a copy of the Investor Proposal and, as intended, relied upon representations made therein and other information provided by Defendants when considering whether to make the loan at issue in this case.

22.     The Investor Proposal described the individuals and companies that made up the joint venture and described four programs in which lenders could participate; a Bronze Program, a Silver Program, a Gold Program, and a Platinum Program, which differed only by the principal amount loaned and the interest rate for same.

23.     Ultimately, Plaintiffs decided to participate in the Platinum Program, which required a loan of at least $150,000.00 and promised 22% annual simple interest, with quarterly interest payments of $8,250.00 over a five (5) year period, at which time the principal of the loan would be returned to Plaintiffs in full.

24.     Defendants expressly promised multiple times that the loan would be a secured loan, secured by liens on mobile homes purchased with the loan

proceeds, and without such promises, Plaintiffs never would have made the loan at issue.

25.     In that regard, Defendants represented in their Investor Proposal and in at least one telephone discussion between Stahl and Trofimoff that the loan proceeds would be used to purchase mobile homes and that the loan would be secured by listing the lender, in this case, Stahl's company, NRAC1, as lienholder on one or more mobile homes having a value equal to or greater than the principal amount of the loan.

26.     Defendants also promised and represented in their Investor Proposal, and in at least one telephone discussion between Stahl and Trofimoff that the loan would be further secured by having the mobile homes insured for their replacement value and having NRAC1 listed as a beneficiary on a "key man" insurance policy taken out on Van Gundy in an amount equal to the principal amount of the loan.

27.     At or around that same time, Defendants also provided Plaintiffs with a certain *Investor Disclosures* document (the "Investor Disclosures") which contained additional representations, promises, and disclosures about the loan.  A true and correct copy of the Investor Disclosures is attached as Exhibit "2" hereto.

28.     Defendants, through their Investor Disclosures and in multiple

telephone and email discussions between Stahl and Trofimoff, also promised and represented that the first interest payment of $8,250.00 would be made to NRAC1 ninety (90) days after the loan proceeds were available to Defendants, and that a signed copy of the Investor Disclosures would be sent immediately to Plaintiffs. Defendants also promised to immediately send Plaintiffs a promissory note memorializing the loan.

29.     In their Investor Disclosures, Defendants also again reiterated that NRAC1's loan would be secured by mobile homes purchased with the loan proceeds.

30.     In that regard, Defendants promised and expressly represented in their Investor Disclosures that NRAC1's loan would be secured by having NRAC1 listed as a lienholder on one or more mobile homes "within the corporation" and that a "Record of Lienholder would be sent by Outstanding Real Estate Solutions, Inc. or, GMHI on or before six (6) months following receipt of funds."

31.     On November 5, 2020, Trofimoff even informed Stahl by email that Defendants had already started looking for the mobile homes by which the loan would be secured, and had already "found some very good deals."  A true and correct copy of Trofimoff's November 5, 2020 email is attached as Exhibit "3"

hereto.

32.     On November 6, 2020, Trofimoff emailed Stahl a payout schedule specifically stating the date that each interest payment would be made, and promised that if the loan was funded by November 14, 2020, the first interest payment would be made in February 2021.  A true and correct copy of Trofimoff's November 6, 2020 email and the payout schedule are attached as composite Exhibit "4" hereto.

33.     Obviously, these representations were integral to Plaintiffs' decision to loan $150,000.00 to Defendants.  Unfortunately, many of the representations that Defendants made and, in particular, those concerning how and when NRAC1's loan would be repaid and secured, were false, and Defendants knew they were false when made.

**The Loan Agreement and Promissory Note**

34.     Defendants made the above-referenced promises and representations to Plaintiffs in an effort to convince and induce Plaintiffs to participate in one of Defendants' four lender programs and to loan money to Defendants, and, in particular, to convince and induce NRAC1 to loan the $150,000.00 to Defendants Viridis and Outstanding and Defendants' joint venture.

35.     Based upon Defendants' representations and promises, the parties entered into a loan agreement (the "Loan Agreement") pursuant to which NRAC1 would loan Viridis and Outstanding the principal amount of $150,000.00 at an interest rate of 22% per annum, with the loan to be paid back with quarterly interest payments of $8,250.00 beginning ninety (90) days after funding, with additional such payments to be made every three (3) months for five (5) years, at the conclusion of which the principal would be returned to NRAC1.

36.     In order to fund the loan, Trofimoff instructed Stahl and NRAC1to wire the money to an account owned by Trofimoff and Viridis at a JPMorgan Chase Bank located in Peachtree City, Georgia.  A true and correct copy of the *Georgia Mobile Home Investing Wire Instructions* document, redacted as required by Fed. R. Civ. P. Rule 5.2, is attached as Exhibit "5" hereto.

37.     On November 5, 2020, Defendants executed and, the following day, delivered a certain *Ga Mobile Home Investing Promissory Note* (the "Promissory Note") to NRAC1 on behalf of Outstanding and Viridis and their Joint Venture.  A true and correct copy of the Promissory Note is attached as Exhibit "6" hereto.

38.     On the face of the Promissory Note, it stated that the Promissory Note could be executed by either Van Gundy or Trofimoff in their capacity as managing

-11-

members of Outstanding Real Estate Solutions or GMHI.  In this instance the

Promissory Note was executed and acknowledged in front of a notary by Van

Gundy.

39.     The Promissory Note memorialized the terms of the loan agreement

(the parties, amount, interest rate, and term of the loan), and, in particular,

included the following *Terms of Payment*:

> Twenty (20) interest only payments of $8,250.00 will be made every three
> months (quarterly) for a total term of sixty (60) months, with the first
> payment at 95 business days following availability of funds.  Payments will
> be issued between the 18th and 25th of the month in which the quarterly
> payment is due and mailed to the mailing address above unless the borrower
> is notified in writing of an address change. First payment will occur in
> February 2021, with a final lump sum principal payment of $150,000 paid
> after maturity of this note during month sixty one (61) in December 2025.
> All payments shall be made to the Lender through Viridis Holdings LLC /
> DBA / Georgia Mobile Home Investing.
>
> If a payment is missed, the Lender can accelerate payment of the entire
> amount of this note and call it fully due.

40.     On November 10, 2020, NRAC1 wired the principal loan amount of

$150,000.00 to Defendants Viridis and Outstanding (c/o Viridis) pursuant to the

Wire Instructions provided by Defendants.

41.     At this time, it is unknown what exactly happened to the loan proceeds

once they were deposited into Viridis and Trofimoff's Georgia bank account, but on

information and belief, Viridis and Trofimoff in turn wired the $150,000.00 from their account to a bank account owned or controlled by Outstanding and Van Gundy.

42.    Whatever and whoever's bank account eventually took possession of the loan proceeds, it is clear that Defendants and their joint venture were running their scheme of purported secured loan transactions such as the one at issue in this case through and using the State of Georgia and Georgia instrumentalities, the Georgia parties, and the Georgia parties' JPMorgan Chase Bank account in located in Peachtree City, Georgia.

43.    In that regard, Trofimoff has continuously insisted that, although NRAC1 was instructed to wire the $150.000.00 to the Viridis/Trofimoff bank account in Georgia, the interest payments owed to NRAC1 could only be made when monies for those payments were sent back to Georgia by Van Gundy and Outstanding, and only when authorized by Van Gundy herself.

44.    In fact, despite Defendants' having clearly represented and held themselves out prior to the loan being made as a joint venture and as partners, Trofimoff now insists that he is and was used as a mere "broker" or "loan servicer" for Van Gundy and Outstanding, pursuant to an agreement they reached when Van

Gundy met with him in Georgia several years ago.

**Defendants' Default**

45.     The first payment under the Loan Agreement and Promissory Note was due on February 25, 2021.

46.     No payment was made on that date.

47.     Plaintiffs contacted Defendants about the status of the payment and received numerous assurances, promises, and excuses from Trofimoff about the status of that first payment.

48.     On or about March 17, 2021, Plaintiffs also received an email from Outstanding's Director of Operations, Megan Dockens, forwarding a letter from Van Gundy appearing to claim that delays were the result of issues with Defendants' banking and processing companies and also explaining the delay in providing such update on "unusual weather in Texas last month."   A true and correct copy of Megan Dockens' March 17, 2021 email and Van Gundy's letter are attached as composite Exhibit "7" hereto.

49.     Obviously concerned that Defendants failed to make even the very first payment on the loan, Plaintiffs requested the lienholder and key man insurance documentation promised for the loan.

50.     On April 7, 2021, Trofimoff emailed and informed Plaintiffs for the first time that Defendants no longer sent out the lienholder documentation to lenders, and later admitted that Defendants had not actually been sending out such documentation since late 2018.  A true and correct copy of Trofimoff's April 7, 2021 email is attached as Exhibit "8" hereto.

51.     On April 12, 2021, forty-six days (46) following the promised first payment date, NRAC1 received the first interest payment by ACH transfer from the Georgia JP Morgan Chase bank account purportedly owned by Trofimoff and Viridis, with the authorization of and with funds sent to Georgia by Van Gundy and Outstanding.

52.     The second payment under the loan and promissory note was due on May 25, 2021.

53.     Defendants again failed to make the promised payment on this date.

54.     Following this failure, Plaintiffs continued to request additional details about and documentation for the security for the loan, as well as the status of the payment.

55.     On June 17, 2021, Trofimoff emailed and informed Stahl for the first time that NRAC1's loan was not actually secured at all as promised.   A true and

correct copy of Trofimoff's June 17, 2021 email is attached as Exhibit "9" hereto.

56.     In that regard, Trofimoff now claimed that the law prevented Defendants from having NRAC1secured and listed as a lienholder on mobile homes purportedly purchased with the loan proceeds, and admitted that Defendants were aware of and should have notified Plaintiffs of this fact prior to the loan having been made.

57.     Trofimoff also informed Stahl for the first time that Defendants were not going to provide the promised information and documentation showing that NRAC1 was listed as a beneficiary on Van Gundy's key man insurance policy.

58.     Nonetheless, Trofimoff claimed he would provide payoff information for the second interest payment as soon as he heard from Van Gundy.

59.     Still no payment had been received by July 2021, and Trofimoff continued making excuses and promises which never bore out, including promises on July 16, 2021 that Defendants were "about to start payouts [the following] week" and on July 24, 2021 that payments were going to be "happening [in the] coming week."

60.     When those promise again proved untrue, Plaintiffs were forced to retain legal representation.

61.     On or about August 6, 2021, Plaintiffs, by and through counsel, notified Defendants that they were in breach of the Loan Agreement and Promissory Note, that the loan had been accelerated and called fully due, and demanded payment for same.

62.     On August 27, 2021, undersigned counsel called and spoke with Trofimoff, again informing him that Defendants were in default and that they were also guilty of fraud for the numerous misrepresentations they had made to induce NRAC1 to make the loan.

63.     Presumably as a result of these communications, Outstanding made a payment of $8,250.00 to NRAC1 on September 1, 2021.

**Plaintiffs and Defendants reach a settlement Agreement.**

64.     Two days later, on September 3, 2021, undersigned counsel notified Defendants that regardless of this September 1st payment, Defendants had still defaulted on the loan and that the loan had been accelerated and called due, and that Defendants were also guilty of fraud.

65.     Nonetheless, Plaintiffs, by and through undersigned Georgia counsel, proposed a settlement and resolution of Plaintiffs' claims against Defendants if Defendants returned NRAC1's loan principal, plus interest owed to that point, plus

attorney's fees, minus the amount of the two (2) payments already made.

66.    At the request of Defendants, Plaintiffs' counsel sent Defendants a more formal settlement offer specifying that this settlement payment in the total amount of $168,040.41 could be repaid on or before October 15, 2021.

67.    Defendants agreed to the offer on September 16, 2021, and on October 6, 2021, the parties executed a *Settlement Agreement and Mutual Release* (the "Settlement Agreement") prepared by counsel in Georgia to that effect.  A true and correct copy of the Settlement Agreement is attached as Exhibit "10" hereto.

68.    Pursuant to the Settlement Agreement, Defendants promised and agreed that that the settlement payment in the amount of  $168,040.41 would be paid to Plaintiffs via wire transfer to NRAC1 by October 15, 2021,

69.    The Settlement Agreement also contained an attorney's fee provision pursuant to which Plaintiffs would be entitled to recover their reasonable attorneys' fees and all costs of litigation in the event that legal counsel were utilized to collect the amounts owed under that agreement.

70.    No payment of any amount was made by October 15, 2021 as promised.

71.     On October 19, 2021, Plaintiffs' counsel sent Defendants a *Notice of Default and Demand for Payment* letter (the "Default Notice and Payment Demand") notifying Defendants that they had defaulted on the Settlement Agreement and providing Defendants with ten (10) days to cure such default.  A true and correct copy of the Default Notice and Payment Demand is attached as Exhibit "11" hereto.

72.     The Default Notice and Payment Demand further notified Defendants that the attorneys' fee provision of the Settlement Agreement would be enforced, and that Defendants had ten (10) days from receipt of the letter to pay the $168,040.41 in full without payment of attorney's fees.

73.     No payment was received by that date or at anytime thereafter, causing Plaintiffs to have to bring this suit.

## COUNT I

## FRAUD (ALL DEFENDANTS)

74.     Plaintiffs restate and incorporate by reference the allegations contained in paragraphs 1 through 73 above as if stated verbatim herein.

75.     In order to induce NRAC1 to wire and loan Defendants $150,000.00, Defendants knowingly and intentionally made numerous misrepresentations to

-19-

Plaintiffs, to wit: Defendants misrepresented to Plaintiffs that they would pay back the $150,000.00 loan according to a specific payment schedule, misrepresented that the loan would be secured by liens in NRAC1's favor on mobile homes purchased with the loan proceeds, misrepresented that they would provide documentation of these liens to Plaintiffs, misrepresented that NRAC1 was to be listed as a beneficiary on certain key man insurance, and made other misrepresentation as set forth herein.[4]

76.    Defendants knowingly made these misrepresentations to Plaintiffs in an effort to induce Plaintiffs to agree to loan money to Defendants and to induce NRAC1 to wire monies to Defendants.

77.    Plaintiffs, and, in particular, NRAC1, justifiably relied on Defendants misrepresentations to their detriment and agreed to loan funds to Defendants, and in reasonable reliance thereto, NRAC1 did in fact wire $150,000.00 to Defendants.

78.    NRAC1 has suffered damages because of the misrepresentations of Defendants.

---

[4]    It is suspected that additional promises and representations made by Defendants to Plaintiffs were false, and that such falsity will come to light in connection with Plaintiffs' prosecution of this action, at which time Plaintiffs will seek leave to amend this complaint to include such additional fraudulent misrepresentations.

79.     NRAC1 is therefore entitled to recover from Defendants in an amount to be shown at trial.

## COUNT II

## BREACH OF LOAN AGREEMENT (VIRIDIS & OUTSTANDING)

80.     Plaintiffs restate and incorporate by reference the allegations contained in paragraphs 1 through 79 above as if stated verbatim herein.

81.     Defendants Viridis and Outstanding entered into a Loan Agreement with NRAC1 pursuant to which NRAC1 agreed to loan $150,000.00 to Viridis and Outstanding, and these Defendants agreed to pay back this loan amount plus interest of 22% per annum with quarterly interest payments and a final lump sum principal payment over a period of five (5) years.

82.     Defendants Viridis and Outstanding have failed to make the quarterly interest payments in accordance with the Loan Agreement between the parties, and have failed to pay back any of the interest and principal owed on the loan except the two payments totaling $16,500.00.

83.     Defendants Viridis and Outstanding are in breach of the Loan Agreement, and NRAC1 has suffered damages as a result of this breach.

84.    NRAC1 is entitled to recover from Defendants Viridis and Outstanding the principal amount of $150,000.00, plus interest of 22% per annum, minus the interest payments of $16,500.00 already paid.

## COUNT III

## BREACH OF PROMISSORY NOTE (VIRIDIS & OUTSTANDING)

85.    Plaintiffs restate and incorporate by reference the allegations contained in paragraphs 1 through 84 above as if stated verbatim herein.

86.    Defendants Viridis and Outstanding executed and delivered a Promissory Note in favor of Plaintiff NRAC1 in the principal amount of $150,000.00 with interest of 22% per annum.

87.    Viridis and Outstanding defaulted on their payment obligations under the Promissory Note.

88.    NRAC1, by and through counsel, has notified Defendants of their default and has demanded payment of the principal and interest provided by the Promissory Note.

89.    Despite this demand, Viridis and Outstanding have failed and refused to pay the amounts due and owing on the Promissory Note.

90.    As a result of this failure, Viridis and Outstanding have breached and

defaulted on the Promissory Note.

91.     Accordingly, NRAC1 is entitled to recover from Defendants Viridis

and Outstanding the principal amount of $150,000.00, plus interest of 22% per

annum, minus the interest payments of $16,500.00 already paid.

## COUNT IV

## BREACH OF SETTLEMENT AGREEMENT (ALL DEFENDANTS)

92.     Plaintiffs restate and incorporate by reference the allegations

contained in paragraphs 1 through 91 above as if stated verbatim herein.

93.     The Settlement Agreement is a valid and enforceable contract to

which Plaintiffs and Defendants mutually assented.

94.     Under the Settlement Agreement, Defendants agreed to pay Plaintiffs

the sum of $168,040.41 on or before October 15, 2021.

95.     Defendants breached the terms of the Settlement Agreement because,

to date, Defendants have not made any payment whatsoever in accordance with the

Settlement Agreement.

96.     Consequently, Plaintiffs have suffered a liquidated amount of damages

in the amount of $168,040.41 as a result of Defendants' breach of the Settlement

Agreement.

97.    Plaintiffs are entitled to a judgment against all Defendants for the full amount owed under the Settlement Agreement of $168,040.41, plus interest thereon.

## COUNT V

## PUNITIVE DAMAGES

98.    Plaintiffs restate and incorporate by reference the allegations contained in paragraphs 1 through 97 above as if stated verbatim herein.

99.    Defendants' acts and omissions as alleged herein show that they are guilty of willful misconduct, malice, fraud, wantonness, and conscious indifference to the consequences of their actions such that Plaintiffs are entitled to recover punitive damages from Defendants.

100.   Defendants are therefore liable to Plaintiffs for punitive or aggravated damages in an amount to be determined at trial.

## COUNT VI

## ATTORNEYS' FEES - CONTRACTUAL

101.   Plaintiffs restate and incorporate by reference the allegations contained in paragraphs 1 through 100 above as if stated verbatim herein.

102.   Pursuant to the Settlement Agreement, Plaintiffs are entitled to recover

from Defendants their reasonable attorneys' fees and costs of litigation.

103.    Accordingly, Defendants are liable to Plaintiffs for Plaintiffs' reasonable attorneys' fees and costs of litigation.

## COUNT VII

### ATTORNEYS' FEES – O.C.G.A. § 13-6-11

104.    Plaintiffs restate and incorporate by reference the allegations contained in paragraphs 1 through 103 above as if stated verbatim herein.

105.    Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense by forcing them to retain counsel and to bring this suit in order to recover monies owed to them,

106.    Accordingly, Plaintiffs are entitled to recover from Defendants all of their costs and expenses, including attorney's fees, incurred by them in connection with this matter and this suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1.      that judgment be entered on Count I in Plaintiffs' favor and against Defendants in an amount to be shown at trial;

2.      that judgment be entered on Count II in Plaintiff NRAC1's favor and against Defendants Viridis and Outstanding in the principal amount of $150,000.00, plus interest of 22% per annum, minus the interest payments of $16,500 already paid;

3.      that judgment be entered on Count III in Plaintiff NRAC1's favor and against Defendants Viridis and Outstanding in the principal amount of $150,000.00, plus interest of 22% per annum, minus the interest payments of $16,500 already paid;

4.      that judgment be entered on Count IV in Plaintiffs' favor and against Defendants in the amount of $168,041.41, plus interest thereon;

5.      that Plaintiffs be awarded punitive damages against Defendants;

6.      that Plaintiffs have and recover from Defendants their costs of this action, including attorneys fees; and

7.      that Plaintiffs have such further general relief as the Court deems just and proper.

Respectfully submitted this 15th day of December, 2021.

(Signature on following page)

-26-

**THRIFT & MCLEMORE, LLC**

/s/Jonathan A. Barash
Jonathan A. Barash
Georgia Bar No. 036799

Attorneys for Plaintiffs Douglas Stahl
and NRAC1, LLC

1000 Parkwood Circle, SE, Suite 375
Atlanta, Georgia 30339
678-784-4150 (office main)
678-623-5872 (fax)
404-314-7041 (direct cell)
jbarash@thriftlegal.com